**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ROBERT T. IANNUCCI,

                         Plaintiff,                         1:16-cv-00357 (BKS/DJS)

v.

ALLSTATE INSURANCE COMPANY,

                         Defendant.

---

**Appearances:**

*For Plaintiff:*
Derek J. Spada
Basch & Keegan, LLP
307 Clinton Avenue
P.O. Box 4235
Kingston, NY 12402

*For Defendant:*
Daniel C. Fleming
Wong Fleming, P.C.
300 East 42nd Street, 14th Floor
New York, NY 10017

**Hon. Brenda K. Sannes, United States District Court Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Robert T. Iannucci commenced this action in the Supreme Court of the State of

New York, Ulster County, on February 12, 2016, alleging breach of contract after Defendant

Allstate Insurance Company ("Allstate") denied his claim for coverage of the roof collapse of his

building located at 221 Catherine Street in Kingston, New York. (Dkt. No. 2). On March 30,

2016, Allstate removed this action to the United States District Court for the Northern District of

New York based on diversity of citizenship under 28 U.S.C. § 1332. (Dkt. No. 1). On June 19

and 20, 2018, the Court held a two-day bench trial in Albany, New York, at which six fact witnesses and four expert witnesses testified. (Dkt. Nos. 94–95). Both parties have submitted proposed findings of fact and conclusions of law. (Dkt. Nos. 96, 97, 99, 101). The Court has carefully considered the trial record, the credibility of the witnesses at trial, and the submissions of the parties. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## II.     FINDINGS OF FACT[1]

### A.     221 Catherine Street Property

In 2005, Plaintiff purchased a parcel of land together with a building located at 221 Catherine Street in Kingston, New York. (T. 96–97). The three-story building was a multi-family residential brick structure, built in approximately 1870, with a wood-framed gable roof topped with asphalt shingles. (Ex. P-3, at 1; D-12, at 000536; Ex. D-35, at 2). Plaintiff testified that he paid $125,000 for the property. (T. 96, 391). No one resided in the building at the time Plaintiff purchased the property or afterward; Plaintiff testified that he intended to use the building as an anchor structure for a larger residential project. (T. 97, 103–104, 139). Plaintiff disconnected the building from electric, gas, and water utility lines; removed the bathrooms and kitchens; and boarded up the first-story doors and windows. (T. 97, 106, 151).

The building was not well maintained. (*See, e.g.*, T. 100–03, 190, 206; Ex. D-28(a)–(c)). Plaintiff testified that, other than occasional exterior inspections and lawn work, he did not perform or have any work performed on the building between 2005 and 2014. (T. 113, 141, 150–151). One long-time neighbor described the building as "abandoned," "condemned," and

[1] The Court cites to the consecutively paginated trial transcripts of June 19 and June 20, 2018, (Dkt. Nos. 94–95), as "T.," Plaintiff's trial exhibits as "P-_," and Allstate's trial exhibits as "D-_." When citing to exhibits admitted into evidence at trial, the Court cites to the Bates numbering assigned to each document where possible, omitting the "ALLSTATE" prefix.

deteriorating. (T. 190). Photos of the property from 2012, obtained from Google Street View, show damage to the bricks, mortar, gutters, and fascia of the building, as well as a small tree growing at the roofline.[2] (Ex. D-28(a)–(c)). Between 2011 and 2013, the Kingston Fire Department (the "KFD") issued multiple zoning/ordinance violation notices ordering Plaintiff to make various improvements to the building and property. (*See, e.g.*, Exs. D-11; D-12 (May 23, 2012 violation notice stating that building was "abandoned and [no] work being done to maintain the building" and that "[t]here is a tree growing out of the roof"); D-13 (May 6, 2011 violation notice stating that the "entire exterior of the building is in need of repairs including the siding, soffits, fascias, windows and doors")).[3]

One such violation notice, issued on October 17, 2013, stated that "the roof on your house needs to be replaced" and warned Plaintiff that "[f]ailure to begin work" to remedy the violation would result in a fine. (Ex. D-11). Plaintiff responded by writing to KFD Deputy Fire Chief David Allen, explaining that he had "done nothing to the property" since receiving the notice and that he believed there were "good reasons to allow the property to remain in its present condition." (Ex. D-18). Plaintiff testified that, shortly after receiving the notice, he contacted Ian Horowitz of J&A Roofing to inspect the roof. (T. 111).

Mr. Horowitz did not testify at trial.[4] Mr. Horowitz testified at deposition that he inspected the roof in October 2013 by climbing a ladder to check the condition of the shingles

---

[2] Mr. Iannucci described the tree as "a little bush that was growing in the gutter." (T. 102). The 2012 Google Street View images, however, indicate that there was no gutter remaining at the roofline where a tree was apparently rooted. (Ex. D-28(b)–(c)). The tree remained in place after the roof collapse. (Ex. D-6, at 000595; T. 78–79). Accordingly, the Court does not credit Mr. Iannucci's testimony that the tree was growing from a gutter. The tree was either rooted in the masonry wall of the building, as both parties' engineers testified, (T. 36, 79, 304, 309), or somewhere inside the attic itself, as the Allstate claims adjuster testified, (T. 286).

[3] "Soffits" are the undersides of the eves overhanging a building's exterior wall; fascia are exterior boards running along the roofline, to which gutters are typically attached. (T. 56, 67, 69).

[4] On June 12, 2018, one week before trial, Plaintiff requested that the trial be adjourned because Mr. Horowitz would be "away" and "unable to testify at trial." (Dkt. No. 88). Defendant opposed the request, noting, *inter alia*,

and by accessing the attic to view the supporting elements beneath. (Ex. P-17, at 15–17). He testified that the asphalt shingles of the roof were loose and worn, but that, as viewed from the attic, the underlying structure—the decking, joists, and rafters—were sound with no sagging, bent, or rippling areas in the ceiling. (*Id.* at 17, 21–23). That testimony is not consistent with the photographic evidence and the credible testimony of the Defendant's engineer, its claims adjuster, and its architectural and roofing expert. (*See* T. 256–57, 269–70, 337–38, 377–79). The Court, therefore, does not credit Mr. Horowitz's testimony regarding the state of the roof in October 2013.

Plaintiff testified that, as a result of Mr. Horowitz's inspection, he intended to replace the shingles—but not the rafters, decking, or other underlying structural elements of the roof—at the end of the winter "when the weather would be more friendly." (T. 112). Before any such work was performed, however, the roof collapsed during a snowstorm on February 21, 2014. (Ex. P-1, at 000355; Ex. D-16, at 001399–401).

### B.     Allstate Policy

From the time he purchased the Catherine Street building in 2005, Plaintiff insured the property under Allstate's "New York Landlords Package Policy" (the "Policy"). (Ex. D-1, at 000677). The Policy provides a maximum of $103,000 in dwelling protection coverage and up to an additional 5% of that amount, or $5,150, for debris removal following a covered loss. (Ex. D-1, at 000645–46, 000682). The Policy states that "[l]oss to property insured by this policy . . . will be settled on an actual cash value basis," and specifies, in relevant part, that "[p]ayment will

---

that Plaintiff, having known of the trial date for seven months, had "plenty of time to secure Mr. Horowitz's availability or to alert the Court well in advance of June 19 that Mr. Horowitz was not available," and that there was no explanation as to why Mr. Horowitz was not available. (Dkt. No. 90, at 2). The Court denied Plaintiff's request, but noted that Mr. Horowitz could testify by video or that Plaintiff could introduce a deposition transcript. (Dkt. No. 91). Plaintiff did not seek to have Mr. Horowitz testify by video; he instead relied upon Mr. Horowitz's deposition testimony. (Ex. P-17; T. 179).

not exceed the smallest of: (a) the actual cash value of the damaged [or] destroyed . . . property at the time of loss; (b) the amount necessary to repair or replace the damaged [or] destroyed . . . property with other of like kind and quality." (*Id.* at 000663; T. 225–26).

The Policy under which the Catherine Street property was insured contains both "all-risk" coverages—meaning coverage for any loss or cause of loss, except those expressly excluded from coverage—and named-peril coverages that extend protection only to losses caused by specific risks. (T. 227–29). To that end, "Coverage A"—the all-risk section of the Policy—extends coverage to an insured's "dwelling, including attached structures, at the residence premises."[5] (Ex. D-1, at 000674). The Policy states that Allstate "will cover sudden and accidental direct physical loss" to such structures, "except as limited or excluded" in the Policy. (*Id.* at 000675). Under the heading "Losses We Do Not Cover Under Coverages A and B," the Policy lists twenty-three exclusions, and explains that Allstate does "not cover loss . . . consisting of, or caused by," *inter alia*:

> 6. Enforcement of any building codes . . . regulating the . . . demolition of any building structure . . . .
>
> 7. The failure of an insured person to take all reasonable steps to save and preserve property when the property is endangered by a cause of loss we cover.
>
>    . . . .
>
> 12. Collapse of a building structure or any part of a building structure, except as specifically provided in Section I— Additional Protection under item [6],[6] "Collapse."
>
>    . . . .

---

[5] Coverages B and C, on the other hand, extend coverage to certain non-dwelling structures and personal property situated on the premises. (Ex. D-1, at 000675, 000678).

[6] The Policy incorrectly indicates that the "Collapse" provision under "Section I—Additional Protection" is item 7. (*See* Ex. D-1, at 000676). The "Additional Protections" section of the Policy does not contain an item 7. (*See id.* at 000682–83).

15. (a) Wear and tear, aging, . . . deterioration . . . or latent defect; . . . (c) Growth of trees, shrubs, [or] plants . . . ; (d) Rust or other corrosion, mold, wet or dry rot; . . . (g) Settling, cracking, shrinking, bulging or expansion of . . . walls, floors, roofs or ceilings;

. . . .

23. [F]aulty, inadequate or defective: . . . (d) maintenance . . . .

(*Id.* at 00675–78). Subsection 24 of the "Losses We Do Not Cover" exclusion section contains a predominant cause exclusion, which states that, in the event that "there are two or more causes of loss to the covered property" and the "predominant cause(s) of loss is (are) excluded," Allstate will not cover the loss. (*Id.* at 000678).

In addition to all-risk coverage subject to specified exclusions, the Policy also contains a "Section I—Additional Protection" section listing named-perils covered beyond those encompassed by Coverages A, B, and C. (*Id.* at 000682). These "Additional Protection[s]" include, for example, the cost of removing debris resulting from a covered loss and certain specified collapses. (*Id.*; T. 227). The collapse provision in the "Additional Protection" section ("Additional Protection 6") provides that Allstate "will cover: (a) the entire collapse of a covered building structure; (b) the entire collapse of part of a covered building structure; and (c) direct physical loss to covered property caused by (a) or (b) above." (Ex. D-1, at 000682). For such coverage to apply, however, the Policy specifies that any such collapse must "be a sudden and accidental direct physical loss caused by one or more" of six named causes. (*Id.*). In relevant part, these causes include "(b) hidden decay of the building structure [or] . . . (e) weight of rain or snow which collects on a roof." (*Id.* at 000682–83).

## C.    Allstate's Denial

On March 3, 2013, the KFD issued a "violation notice and order to remedy," directing Plaintiff to demolish the Catherine Street building because the "roof ha[d] collapsed[,] causing

an unsafe environment to the safety of the public." (Ex. D-16, at 001403). Multiple documents in the City of Kingston's "street file" on the Catherine Street property indicated that the collapse of the roof was caused by "heavy accumulation of snow," (*id.* at 001399), or "accumulation of heavy snow," (*id.* at 001401).[7]

Plaintiff notified Allstate of the collapse on March 4, 2014; Allstate began its investigation of the collapse immediately thereafter, scheduling an inspection of the Catherine Street property for March 7, 2014. (T. 233; Ex. P-1, at 000355). John Kirk, an Allstate claims adjuster,[8] traveled to the property sometime in early March 2014, where he observed and photographed extensive damage to the building. (T. 251–52; Ex. D-5, at 000363–80). He noted flaking brick and mortar, water damage, burned rafters, and a tree growing out of the roof, among other indicators of "long-term deterioration." (T. 252–58). Morris Reid, who performed a property inspection and valuation assessment for EFI Global at Allstate's request, testified that the building was poorly maintained and that he observed charred rafters, a tree growing in the mortar near the roofline, cracks in brickwork, and uneven settling of the foundation walls. (T. 318–23, 327). Mr. Reid's March 31, 2014 property condition assessment attributed the collapse to weakening from deterioration that caused the roof to fail under the weight of snow. (Ex. D-6,

---

[7] The Court notes that the City file contains an unsigned June 27, 2014 draft of a letter addressed to Plaintiff from the "Kingston Fire Department Building Safety Division." (Ex. D-16, at 001454). The draft, which Plaintiff acknowledged either drafting personally or collaboratively with an unnamed City of Kingston employee, (T. 172–174), states that: (i) Plaintiff complied with all violation notices issued to him; (ii) the October 17, 2013 notice ordering him to replace the roof on the Catherine Street property "focused on the roof *covering*, not the underlying" structure; (iii) the cause of the collapse of the roof was snow, not inadequate maintenance; and (iv) other roofs in Kingston had collapsed that winter under the weight of snow. (Ex. D-16, at 001454). KFD Deputy Chief Thomas Tiano testified that he had no knowledge of the letter, but that some of the conclusions contained therein contradicted both his personal knowledge of the property and other information contained within the street file. (T. 197–204). The street file also contains a substantially similar version of the letter, dated July 3, 2014 and signed by KFD Deputy Fire Chief David Allen. (Ex. D-16, at 001502). The Court credits the testimony of Deputy Chief Tiano regarding these documents. Considering the questionable origin, authorship, and content of the letters, the Court finds that the letters are unreliable as evidence and, accordingly, are entitled to no weight.

[8] Mr. Kirk testified that he is an employee of Pilot Catastrophe Services, an independent contractor that performs property inspections and claims adjusting work on Allstate's behalf.

at 000542). In his assessment, Mr. Reid estimated that, assuming that no snow melted in February 2014 due to constantly below-freezing temperatures, there would have been approximately 37.5 inches of snow on the roof at the time of the collapse. (*Id.* at 000552).

On April 22, 2014, Allstate denied Plaintiff's claim based on the conclusion of Mr. Reid's EFI Global report that the "cause of the roof collapse [was] . . . a lack of adequate and timely maintenance that resulted in hidden and long term deterioration of the roof rafters, decking and inadequate restraint for the lateral thrust at the ends of the rafters." (Ex. D-6, at 000539 (Reid's March 2014 report); *see also* Ex. D-2, at 000588 (Allstate's denial of coverage letter using same language)). According to the denial letter, the weakness resulting from Plaintiff's failure to maintain the roof ultimately caused "the rafters to fail under snow load conditions well below that which the building framing should have been designed and constructed to withstand." (Ex. D-2, at 000588). In support of its conclusion that Plaintiff's claim was excluded from coverage, Allstate cited several Policy provisions excluding losses caused by or consisting of enforcement of building codes, failure to preserve property endangered by a covered loss, wear and tear, and inadequate maintenance, among others. (D-2, at 000586–87).

On May 5, 2014, Plaintiff requested that Allstate reconsider its denial and review a May 2, 2014 report authored by Timothy Lynch, a structural engineer, regarding the cause of the collapse. (T. 233–34). Mr. Lynch's report stated that, upon inspection of the collapsed roof, he concluded that the "loss was the result of a collapse of a portion of the structure caused by the weight of snow or hidden damage." (Ex. P-3, at 2). Allstate reviewed Lynch's report but reaffirmed its denial on May 15, 2014, (Ex. D-3), and issued a final determination of denial on October 15, 2014, (Ex. D-4).

## D. Cause of the Collapse

At trial, all of the witnesses who gave testimony relevant to the issue expressed similar theories as to the mechanics of the collapse. The consensus view, generally stated, was that: (i) under the weight of the snow, the top plates[9] (and/or the rafters' or joists' connection thereto) failed; (ii) this failure allowed the decking and rafters to slide outward, pushing them out over the brick walls of the building; (iii) as the decking slid outward, the ridge of the roof collapsed downward, flattening across the top of the exterior walls of the building. (*See* T. 30–31 (Lynch), 254–55 (Kirk), 338 (Reid), 379–80 (Cannon); *see also* Ex. D-9, at 000868).[10] While Plaintiff and Allstate's witnesses diverged in their opinions as to contributing factors, including hidden decay, deterioration due to lack of maintenance, or some combination thereof, each witness who testified to the issue agreed that the collapse was caused, at least in part, by the weight of the snow.

Plaintiff's expert structural engineer, Timothy Lynch, testified that he inspected the Catherine Street building in April 2014 after the roof collapsed. (T. 24). Mr. Lynch stated that the weakening in the roof structure was "likely wood rot or deterioration from water intrusion,"

---

[9] At trial and in their submissions, the parties and witnesses variously refer to a "top plate"—where the exterior wall and roof elements are joined—as a "sill plate," (T. 30), "double plate," (T. 254), "rat plate," (T. 341; Dkt. No. 97, ¶ 143), or "rat sill plate," (Dkt. No. 97, ¶ 148). For the sake of clarity, the Court uses the term "top plate" only.

[10] Although the parties and their witnesses used common roofing terminology imprecisely and inconsistently, (*see supra* note 9), the evidence at trial suggested that the key elements of a gable (or "gabled") roof system relevant to the facts here can be generally defined as follows: (i) shingles are the top-most, exterior surface of the roof, frequently composed of asphalt, that protect the decking from the elements, (T. 30, 308, 316); (ii) decking (or sheathing) is the flat, plywood or plank surface underlying the shingles, (T. 30, 257, 385–87); (iii) rafters are wood beams that provide structural support to the decking, running upward at an angle from the top of opposing exterior walls and meeting at a peak, called a ridge, (T. 30, 253); (iv) joists—also called rafter ties—run flat between the tops of two opposing exterior walls, forming a triangle with a set of rafters above, and typically supporting the floor of the attic beneath a gable roof, (T. 26, 317, 380); and (v) top plates—thin, flat wood that runs along the top of the exterior wall—are the surfaces upon which the joists and rafters, typically secured in place with nails, rest atop the exterior walls, (T. 30, 254–55, 315).

and also that he observed fire damage to the rafters.[11] (T. 37, 50–51). He testified that he observed a "tree or bush" that appeared to be rooted "at the top of the masonry wall." (T. 36). On direct examination, Mr. Lynch opined that any deterioration of the top plate would have been "underneath the roof and the roofing" and therefore "would not have been visible." (T. 30–31). According to Mr. Lynch, the roof "was weakened from hidden damage such that the load imposed by . . . the snow[] was able to initiate the collapse." (T. 30–31). He concluded that, although the roof "may or may not have been in a weakened condition," he observed "no other indication of any . . . cause" for the collapse other than the weight of snow. (T. 30–31). The Court notes that while some of the deterioration, including the fire damage, may have been hidden, the tree growing out of the building since at least 2012, with inevitable resulting water penetration, was not. Nor was the damage to the gutter and fascia board, cited in a 2011 violation and visible in 2012 Google Street View photos, "hidden."

Plaintiff's roofing expert, Ian Horowitz, was the only witness who testified that he observed the condition of the roof and its supporting elements before the collapse on February 21, 2014. (Ex. P-17, at 15–22). Following the collapse, he reported observing "classic signs of collapse by live load," including "[c]racked and split rafters as well as main ridge pole and beams completely severed due to weight." (Ex. P-2). Based on his pre- and post-collapse observations of the roof, Mr. Horowitz opined that, despite some deterioration, "the only factor involved" in the collapse of the roof was "heavy snow." (*Id.*). Since, however, the Court does not

---

[11] Multiple witnesses' testimony, as well as photographic evidence, indicates that charring or fire damage to elements of the roof was visible after the collapse. (*See, e.g.*, T. 77, 256, 320). There was no evidence at trial indicating when such damage may have occurred, (T. 281, 346), and the KFD street file does not contain any record of a fire at the 221 Catherine Street property, (Ex. D-16; *see also* T. 53, 256). The witnesses offered different theories as to how the charring may have occurred, including a fire set inside the house before the collapse, (T. 262, 293), a fire set outside using the post-collapse roof debris for fuel, (P-17, at 49–50), or construction using charred wood, (T. 328, 348).

credit Mr. Horowitz's testimony regarding his pre-collapse inspection, the Court does not credit his opinion regarding the cause of the roof collapse.

The Court credits the testimony of the Defendant's witnesses on this issue. John Kirk, the property adjuster assigned to Plaintiff's claim, testified that, although the snow may have been the triggering event, the building had deteriorated to the point that "it was inevitable that this building was goin[g] to collapse . . . a bird could have done it, too, by landin[g] on it." (T. 258). He testified that the wooden structural components of the roof showed indications of long-term exposure to the elements and described their condition as "almost like a piece of driftwood, it [was] just crumbly." (T. 259). Morris Reid testified that his inspection of the property revealed that all aspects of the building, not just the roof, were inadequately maintained and structurally impaired. (T. 321–26). Mr. Reid stated that this lack of maintenance led to deterioration of the roof over time, until the "roof was in a condition [such that] it would not support the snow load for which it was originally designed." (T. 328). Although Mr. Reid stated that he believed the roof "collapsed because of the weight of the snow," he further testified that it "collapsed under snow load conditions far below which it should have been designed to withstand" due to "inadequate maintenance of the roofin[g] systems." (T. 338). Finally, Herbert Cannon, Allstate's architectural and roofing expert, concluded that, although "the presence of the snow load is what caused the structure to give," (T. 369), there "was enough damage to the structure" that "it was inevitable that . . . the roof would have collapsed." (T. 382). Mr. Cannon noted that, over the course of its lifetime, the roof repeatedly withstood the weight of snow without collapsing; thus prompting him to conclude that "something was going on there that deteriorated the structure to allow the collapse." (T. 381).

## III.    CONCLUSIONS OF LAW

Plaintiff argues that the evidence presented at trial demonstrates that the claimed loss is within coverage because it consisted of a sudden collapse caused by the weight of snow and/or hidden decay. (Dkt. No. 96, at 26, 29–30). Allstate, on the other hand, argues that Plaintiff failed to carry his burden of proving any of the requisite elements under the Policy, (Dkt. No. 97, at 58), and that, in any event, it carried its own burden of proving that the collapse was predominantly attributable to an excluded cause, (*id.* at 60).

### A.    Insurance Contract Interpretation

Under New York law, courts interpret insurance policies like any other contract, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 334 (2013), giving unambiguous provisions of a policy their "plain and ordinary meaning," *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).[12] Ambiguity, where found, must be resolved in favor of the insured. *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257–58 (2016). A policy is ambiguous if the language "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'" *Int'l Multifoods Corp. v. Commercial Union Ins.*, 309 F.3d 76, 83 (2d Cir. 2002) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)); *see also In re Viking Pump, Inc.*, 27 N.Y.3d 244, 258 (2016) ("[A] contract is not ambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no

---

[12] The parties do not dispute that New York law applies to this case. *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (applying New York law where applicable law was not in dispute).

reasonable basis for a difference of opinion." (alteration in original) (internal quotation marks omitted)).

### B. Burdens of Proof

Under New York law, an insurance policy containing both all-risk and named-perils coverage is commonly known as a "hybrid" policy. *Fabozzi v. Lexington Ins. Co.*, 639 F. App'x 758, 761 n.1 (2d Cir. 2015). Under a hybrid policy, an all-risk section provides coverage subject to certain excluded losses or causes of loss; a named-perils section, on the other hand, requires the occurrence of certain conditions or the presence of some expressly described circumstance for a loss to come within coverage. *Id.* at 760. Under either an all-risk or a named-perils policy, the insured carries the burden of demonstrating that the loss claimed is within coverage. *See Int'l Multifoods Corp.*, 309 F.3d at 83 (describing an insured's "relatively light" burden of demonstrating coverage under an all-risk policy); *Fabozzi*, 639 F. App'x at 760 (explaining that the insured must prove that loss claimed satisfies conditions of named-perils coverage). Once an insured demonstrates that their loss is covered, the insurer has the burden of showing that an exclusion applies. *See Miller Marine Servs. v. Travelers Prop. Cas. Ins. Co.*, No. 04-cv-5679, 2005 WL 2334385, at *1, 2005 U.S. Dist. LEXIS 39906, at *10–11 (E.D.N.Y. Sept. 23, 2005), *aff'd*, 197 F. App'x 62 (2d Cir. 2006). If coverage is not barred by an exclusion, then the insured bears the burden of proving damages. *See Alpha Auto Brokers, Ltd. v. Continental Ins. Co.*, 286 A.D.2d 309, 310 (2d Dep't 2001).

As described above, the Allstate Policy excludes "collapse" from coverage under the all-risk section, (Ex. D-1, at 000676), except where the conditions described under a relevant named-perils provision, (*id.* at 000682), are met. Thus, Plaintiff carries the burden of proving that his claim is within coverage under Additional Protection 6. *See Fabozzi*, 639 F. App'x at 761. Assuming Plaintiff satisfies that burden, the claim is within coverage unless Allstate proves

that an exclusion, including the predominant loss exclusion, is applicable. Finally, Plaintiff must prove damages.

### C. Additional Protection 6

The relevant provision, Additional Protection 6, states that Allstate insures the "direct physical loss to covered property caused by" the "entire collapse of a covered building structure" or "the entire collapse of part of a covered building structure." (Ex. D-1, at 000682). The policy further provides that any such collapse must have been a "sudden and accidental direct physical loss caused by one or more of the following," then lists six causal events that trigger coverage. (*Id.*).

#### 1. Entire Collapse

The parties both acknowledge that the loss at issue was an "entire collapse," but dispute the extent of the collapse. Plaintiff argues that the loss was an "entire collapse of a covered building structure" because it "rendered the structure unsafe and beyond repair," eventually requiring total demolition. (Dkt. No. 96, at 33). Allstate contends that, while there was an entire collapse of the roof—"part of a covered building structure"—there was not an entire collapse of the building structure itself. (Dkt. No. 97, at 68).

The Policy does not define "entire collapse."[13] The parties have not identified, and the Court has not found, any New York law interpreting the term. New York law is unsettled on the meaning of the term "collapse." *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 91 (2d Cir. 2009). Plaintiff argues that "collapse" does not require "a falling in, and total or near total destruction" of the building, *Graffeo v. U.S. Fid. & Guar. Co.*, 20 A.D.2d 643, 644 (2d Dep't 1964) (quoting *Weiss v. Home Ins. Co.*, 9 A.D.2d 598, 599 (3d Dep't 1959)), but only a

---

[13] The policy does state that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion." (Ex. D-1, at 000683).

showing of "substantial impairment of the structural integrity" of a building, *Royal Indem. Co. v. Grunberg*, 155 A.D.2d 187, 189 (3d Dep't 1990). That case law, however, addresses the term "collapse," not "entire collapse." Courts have reached varying conclusions as to the meaning of "entire collapse." *Compare Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370, 379–80 (D. Conn. 2017) (ruling that "entire collapse" language unambiguously meant an "actual collapse") *with Maki v. Allstate Ins. Co.*, 320 F. Supp. 3d 380, 384 (D. Conn. 2018) (declining to follow *Agosti*, holding that an "entire collapse of a home's foundation can be reasonably understood to be an entire collapse of part of the covered building structure in the sense that the foundation has completely . . . suffered substantial impairment to its structural integrity"). In any event, since "the clear modern trend" holds that analogous "collapse" coverage provisions "provide coverage if there is substantial impairment of the structure integrity of the building," *Wangerin v. New York Cent. Mut. Fire Ins. Co.*, 111 A.D.3d 991, 992–93 (3rd Dept 2013), an "entire collapse" must mean something more.

To the extent "entire collapse" means an actual collapse, there was not an actual collapse of the building following the snowstorm. On February 22, 2014, the morning after the roof collapsed, KFD examined the building and noted that "the building appeared stable" and the "risk of further collapse did not seem likely." (Ex. D-16, at 001401). It was not until March 3, 2014—more than a week later—that the City of Kingston determined that the roofless structure was a public hazard, at risk of additional collapse. (Ex. D-16, at 001403).[14]

---

[14] As Allstate points out, Plaintiff's reliance on *Jordan v. Allstate Ins. Co.*, 11 Cal. Rptr. 3d 169, 180–82 (Cal. Ct. App. 2004), does not support his contention that the building suffered an "entire collapse." There, although the court determined that the policy's wet or dry rot exclusion was ambiguous in the presence of an "additional coverage" section's inclusion of collapse resulting from hidden decay, it concluded that coverage under the "entire collapse" provision required "actual," rather than merely "imminent," collapse of the structure. *Id.* at 182.

To the extent "entire collapse" can be interpreted to mean a comprehensive or complete "substantial impairment to the structural integrity of the building," that is a harder question. There was conflicting testimony regarding the structural integrity of the building.[15] Plaintiff's structural engineer expert, Mr. Lynch, testified that, when he went to the building in April 2014 with two or three other individuals, he noticed that the exterior walls were "sound . . . they were all straight and standing vertically." (T. 25, 27). He did not see "anything that indicated that the brick" load bearing walls "failed in any way." (T. 70–71). He determined that the building was structurally sound enough to support their weight, went inside the building, and walked up to the second floor. (T. 27, 44). The Court credits the testimony of Mr. Cannon, Defendant's architect, who testified that "[f]rom the outside of the building it looked like it could be saved." (T. 384). Mr. Cannon noted that "you would have to have a structural evaluation" to "find out the condition of the floor supports and of the brick on the inside," but estimated that there was "better than a 50/50 chance that it would be salvageable." (T. 384). Mr. Cannon further noted that, while a structural engineer would have to evaluate the building, the walls were three bricks wide, and where some of the brick had peeled off "the rest of the wall was intact." (T. 383–84).

On the other hand, other witnesses—including Deputy Fire Chief Tiano and Defendant's expert electrical engineer, Mr. Reid—testified that it was not safe to enter the building. (T. 207, 303). In his property assessment, Mr. Reid identified significant deficiencies in the foundation

_____

[15] The demolition notice does not resolve the question. Deputy Fire Chief Tiano explained that it was the Building Department's practice "any time there is structural damage done to a building" to issue a Notice advising the owner to either make repairs immediately or plan to demolish the building. (T. 209–210). Mr. Tiano testified that the "street file" on the property indicates that "the City required the building to be demolished because the roof collapse *affected* the integrity of the building." (T. 220 (emphasis added); *see* Ex. D-16, at 001403 (notice stating that "[a]t this time partial or complete collapse *is possible*")). Mr. Tiano had no involvement with the property after the roof collapse, (T. 220), and there was no testimony regarding the Building Department's evaluation of the structural integrity of the building.

and the external structural frame of the building; he noted that the property had exceeded its useful life and should be demolished. (P-6, at 538, 541).

In any event, the Court need not decide whether there was an "entire collapse" under an expanded definition of that term because, as discussed below, Plaintiff failed to prove that any structural impairment of the building that might constitute an "entire collapse" occurred "suddenly" or as a result of a coverage-triggering event, such as the weight of snow. The Court thus finds that there was an "entire collapse of *part* of a covered building structure"—the roof—within the meaning of the Policy.

### 2.  Sudden and Accidental

Allstate argues that Plaintiff's claim was not within coverage because Plaintiff failed to adduce evidence proving that the collapse of the roof was a "sudden and accidental" loss within the meaning of the Policy. (Dkt. No. 97, at 58).[16] Allstate argues that the loss was not sudden and accidental, "but rather expected due to Iannucci's admitted decision not to ever make any repairs to the roof during the 9 years he owned the property before the roof collapsed." (*Id.*).

The two terms—"sudden" and "accidental"—have separate meanings. *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 632 (1997). A "sudden" loss is "an abrupt happenstance" that occurs "abruptly, precipitantly or brought about in a short time." *Id.* at 632 (emphasis omitted). Here, the loss of the roof was sudden: it collapsed abruptly overnight on February 21, 2014. (Ex. P-16, at 001401); *see also Agosti*, 279 F. Supp. 3d at 378 (examining a similar "Additional Protection" collapse provision and concluding that "it is clear

---

[16] Allstate's argument that, for the loss to be within coverage, Plaintiff was required to prove *both* "an 'entire collapse' of the roof" *and* an "'entire collapse' of the building," (Dkt. No. 97, at 58), does not square with the plain language of Additional Protection 6, (Ex. D-1, at 000682 ("We will cover: (a) the entire collapse of a covered building structure; (b) the entire collapse of part of a covered building structure; and (c) direct physical loss to covered property caused by (a) *or* (b) above." (emphasis added)).

from the language of the policy that it is the *loss*, not the *cause* of the loss that must be 'sudden and accidental'").

Plaintiff failed to prove, however, that any purported "entire collapse" of the building—by virtue of its compromised structural integrity—was sudden. Instead, the evidence at trial established that the building's structural impairment was caused by long-term deterioration and predated the February 21, 2014 collapse of the roof. The Court credits the testimony of Timothy Lynch, John Kirk, and Herbert Cannon, all of whom explained how the deterioration of the roof, including the presence of the tree at the roofline, resulted in water damage to the walls of the building structure over time before the collapse. (T. 48, 255–58, 261, 265, 374–75). John Kirk pointed to disintegrating bricks as an indication that, before the roof collapsed, the building's "structural integrity was already compromised." (T. 284–85). Morris Reid's property condition assessment also noted structural damage to the building that predated the collapse of the roof, including "structural cracks in the sidewall" superstructure and "deteriorated masonry pointing and loose bricks." (Ex. P-6, at 000538). He further identified cracked bricks in the façade reflecting "deterioration over time" that was "totally unrelated to the roof collapse." (T. 321, 327). Furthermore, the Court credits Mr. Reid's testimony that the absence of gutters and drains resulted in erosion of soil surrounding the base of the building structure, causing "differential settlement of the foundation walls." (T. 322–23). Mr. Reid's assessment concluded that "the cracked foundation wall[,] when taken into consideration with the age of the building, [has] no structural value in [its] current condition and should be demolished in its entirety." (Ex. P-6, at 000538). While Mr. Reid testified that "some part" of the building structure "was compromised" because of the roof collapse, (T. 362), the evidence did not reflect what that "part" was and whether it was substantial enough to constitute an "entire collapse" of the building. Based on the

credible trial testimony and photographic evidence, the Court finds that extensive water damage compromised the structural integrity of the building over time, long before the roof collapsed. Accordingly, the Court finds that, while the collapse of the *roof* was sudden, any purported "entire collapse" of the *building structure* was not. Plaintiff therefore failed to prove that the loss of the building structure was within coverage under Additional Protection 6(a).

"Accidental" means "not done 'on purpose'" and is the "antonym of 'purposely.'" *Wolk v. Royal Indem. Co.*, 27 Misc. 2d 478, 484 (2d Dep't 1961). Whether the insured's actions were "negligent, wanton, willful, or even violative of a criminal statute, if the result of such act was not intended then it is accidental." *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.2d 358, 365 (1975) (affirming ruling that damages caused by insured's "calculated risk" were unintended and therefore accidental); *see also Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 316–17 (2d Cir. 2000) ("[T]he key to whether the environmental damage . . . was 'caused by accident' turned here on whether the resulting property damage was caused by [Plaintiff] intentionally."). "The Second Circuit [has] stated, 'Recovery will be barred only if the insured intended the damages or if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act.'" *Travelers Indem. Co. v. Northrup Grumman Corp.*, 3 F. Supp. 3d 79, 101–02 (S.D.N.Y. 2014) (quoting *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1150 (2d Cir. 1989)).

There was no evidence at trial indicating that Plaintiff intended for the loss to occur. The Court finds that, although Plaintiff neglected the Catherine Street building by, *inter alia*, failing to maintain and repair the roof, the roof collapse on February 21, 2014 was an unintended and accidental loss. *See McGroarty*, 43 A.D.2d at 377 ("If the consequences are not adverted to,

however willful the preceding acts, the supervening outcome is unintentional within the definition of an accident." (internal quotation marks omitted)).[17]

### 3.  Caused by Weight of Snow[18]

Finally, Plaintiff adduced evidence at trial sufficient to prove that the collapse of the roof was caused by "weight of . . . snow which collect[ed] on [the] roof." (Ex. D-1, at 000682). Every witness who testified to the issue, including Allstate's, acknowledged that the collapse was caused, at least in part, by the weight of snow. (T. 27, 203, 271, 328, 369). Allstate's post-trial submission acknowledges that the roof "collapsed because of the weight of snow on the roof." (Dkt. No. 97, at 58). Accordingly, Plaintiff has satisfied his burden of demonstrating that the collapse of the roof was within coverage under Additional Protection 6.[19]

### 4.  Direct Physical Loss Caused by the Collapse of the Roof

Plaintiff argues that the building "was razed because it was irreparably damaged due to the roof collapse," and the loss of the entire building is covered as a "direct physical loss" under Additional Protection 6(c). (Dkt. No. 96, at 33).

---

[17] Allstate argues that, given Plaintiff's failure to perform maintenance on the roof, its collapse cannot be considered "unexpected." (Dkt. No. 97, 58–59). The Additional Protection 6 collapse provision, however, does not use that language. *Cf. Northville Indus. Corp.*, 89 N.Y.2d at 629 ("expected" damage was expressly excluded under the policy's definition of "occurrence"); *Technicon Elecs. Corp. v. Am. Home Assur. Co.*, 74 N.Y.2d 66, 74 (1989) (same). Defendant has not cited, and the Court has not found, any case in which a court has read "unexpected" into the terms of a policy.

[18] The Court rejects Plaintiff's assertion that the roof collapse was caused by "hidden decay," which is covered under the Additional Protection provision. The Court credits the testimony of Defendant's architect on the deterioration that was visible since 2012. (T. 373–83). While some deterioration, including the fire damage, may have been hidden, other deterioration depicted in the 2012 photographs—such as the tree growing out of the roof and the water penetration that inevitably resulted—was not. *See, e.g.*, *6 Montague, LLC v. New Hampshire Ins. Co.*, 122 A.D.3d 451 (1st Dep't 2014) (finding coverage for "hidden decay" not applicable when decay "was visible and was a clear indication that the beam within was deteriorating").

[19] Plaintiff failed to prove, however, that any purported "entire collapse" of the building structure was caused by the weight of snow on the roof. As noted above, the structural integrity of the building was compromised before the roof collapsed. The fact that City of Kingston ordered demolition of the building because of its compromised structural integrity is immaterial: "Even though the building required demolition, the event resulting in the loss"—the compromised structural integrity of the building—"was not covered by the provision of the policy insuring against loss attributable to . . . collapse." *Citizens Ins. Co. of Am. v. CMS Risk Mgmt. Holdings, LLC*, 161 A.D.3d 482, 483 (1st Dep't 2018).

"The Second Circuit has defined 'physical loss or damage' in the insurance context as 'strongly impl[ying] that there was an initial satisfactory state that was changed into an unsatisfactory state.'" *Channel Fabrics, Inc. v. Hartford Fire Ins. Co.*, No. 11-cv-3483, 2012 WL 3283484, at *9, 2012 U.S. Dist. LEXIS 113867, at *26 (S.D.N.Y. Aug. 13, 2012) (quoting *City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 44 (2d Cir.2003) (collecting cases and concluding that court was "aware of no cases adopting a contrary interpretation of the term")). "The requirement that the loss be 'physical,' . . . is widely held to . . . preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10A Couch on Ins. § 148:46. "When the structure of the property itself is unchanged to the naked eye . . . and the insured alleges that its usefulness for its normal purposes has been destroyed or reduced, there are serious questions whether the alleged loss satisfies the policy trigger." *Id.*

Plaintiff cites only to the City's demolition notice as evidence of loss caused by the roof's collapse. There was, however, no evidence indicating how the City of Kingston concluded that the building required demolition one week after reporting that the building appeared stable and unlikely to collapse further. There was no evidence showing that the building sustained any distinct, demonstrable, physical alteration or change in condition as a result of the collapse of the roof. The 2012 Google Street View photographs indicate that, before the collapse, the condition of the building's exterior and foundation was poor. (*See* Ex. D-28(a)–(c)). Mr. Reid's assessment noted "significant signs of cracking or movement" in the foundation walls indicating "excessive settlement or an improperly-installed foundation system." (Ex. P-6, 000538). Mr. Kirk testified that he observed "pervasive damage" to the building that predated the collapse of the roof, (T. 265), including cracked and disintegrated bricks resulting from "long-term weather exposure,"

(T. 260–62). Mr. Kirk further testified that, during his inspection of the building, he was specifically examining "how much was damaged by this collapse." (T. 258).

Both the interior and exterior of the building were in poor condition after the collapse. (Ex. D-6, at 000602–04). But Plaintiff failed to prove what new damage or additional impairment—beyond the destruction of the roof—was directly caused by the collapse. For example, Mr. Lynch testified that the extent of the roof collapse was limited "to the attic level or the ceiling joists at the top of the masonry walls." (T. 26). Photographs included in Mr. Reid's property assessment show that the decking of the roof slid outward, lying flat on top of the masonry walls of the building. (Ex. D-6, at 000569). Having considered all of the evidence and the credibility of all of the witnesses, the Court finds that Plaintiff failed to prove that the collapse of the roof caused additional damage that might have arguably been within coverage, such as new damage to the building's interior, superstructure, or foundation; the development of water damage that was not there previously; or damage to property inside the building.[20]

### D.     Predominant Cause Exclusion

Having found that Plaintiff met his burden of demonstrating that the collapse of the roof was a sudden and accidental entire collapse of part of a covered building structure, the Court must next determine whether Plaintiff's claim is excluded from coverage under Additional Protection 6 by the predominant cause exclusion contained within the "Losses We Do Not Cover" section of the Policy. That clause provides that Allstate does "not cover loss to covered property . . . when: (a) there are two or more causes of loss to the covered property; and (b) the predominant cause(s) of loss is (are) excluded" from coverage. (Ex. D-1, at 000678). Allstate

---

[20] Even had Plaintiff shown some direct physical loss beyond the destruction of the roof itself, he failed to adduce evidence indicating the value of any such loss, as described further below.

carries the burden of showing that an exclusion applies, and argues that, "[u]nder *Fabozzi*, if Allstate is able to show that an excluded peril was the predominant cause of the collapse, Allstate will win." (Dkt. No. 97, at 61 (citing *Fabozzi*, 639 F. App'x at 763 n.3)).

The clause on which Allstate relies does not bar coverage where an excluded cause simply *contributed* to the loss, but only where an excluded cause was the *predominant* cause of the loss.[21] Thus, "[t]o determine causation, [we must] look[] to the efficient or dominant cause of the loss, not the event that merely set the stage for that later event." *Gravino v. Allstate Ins. Co.*, 73 A.D.3d 1447, 1448 (4th Dep't 2010) (alternations in original) (internal quotation marks omitted) (discussing insurance policy that "expressly provid[ed] that, where the damage has two or more causes, the loss is not covered if the 'predominant cause(s) of loss is (are) excluded'"). "Only the most direct and obvious [efficient] cause should be looked to for purposes of the exclusionary clause." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 48 (2d Cir. 2006) (emphasis in original) (quoting *Kula v. State Farm Fire & Cas. Co.*, 212 A.D.2d 16, 20 (4th Dep't 1995)).

Here, the evidence at trial did not show that any cause was predominant to the weight of snow in directly bringing about the collapse of the roof. Rather, the preponderance of the evidence indicated that the most direct and obvious cause of the collapse of the roof was the weight of approximately 37.5 inches of snow that had accumulated over the course of the winter. (T. 344–45). While other causes—including deterioration or inadequate maintenance—likely "set the stage" for the collapse during the snowstorm, Allstate failed to prove that any of these causes—considered separately or together—predominated over the weight of the snow as the

---

[21] The clause here is unlike the anti-concurrent clause in *Fabozzi*, where the insurer could prevail by showing that "an excluded peril contributed in any way to the collapse." 639 F. App'x at 763 n.3.

efficient cause of the collapse. *Gravino*, 73 A.D.3d at 1448 (holding that, even though plaintiff's drainage of the pool was a precondition to the loss, pressure from groundwater was "predominant cause" of damaged caused by pool's rise from ground level).

### E. Damages

As noted above, the Policy provides that covered losses "will be settled on an actual cash value basis," further specifying that "[p]ayment will not exceed the smallest of: (a) the actual cash value of the damaged [or] destroyed . . . property at the time of loss; (b) the amount necessary to repair or replace the damaged [or] destroyed . . . property with other of like kind and quality." (*Id.* at 000663). Although the Court has determined that Plaintiff carried his burden of proving coverage under Additional Protection 6 for the collapse of the roof, Plaintiff failed to establish the value of his loss under the Policy.[22]

"The purpose of an action on a[n] . . . insurance policy is to attempt to put the insured in as good a position as he would have been had no [loss] occurred, by awarding him the actual cash value of the property lost or damaged. Actual cash value (ascertained with proper deductions for depreciation) means actual value expressed in terms of money." *Incardona v. Home Indem. Co.*, 60 A.D.2d 749, 749 (1977) (interpreting similarly worded fire insurance policy that provided "that the amount recoverable is 'the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss'"). "The determination of actual cash value is made under a broad rule of evidence which allows the trier of fact to consider every fact and circumstance which would logically tend to the formation of a

---

[22] As Defendant argues, Duane Postupack's estimate of Plaintiff's damages, based solely on the anticipated value of a planned 16,500 square foot residential development, failed to address a loss that is compensable under the policy. (T. 87–88).

correct estimate of the loss." *Cass v. Finger Lakes Co-op. Ins. Co.*, 107 A.D.2d 904, 905 (3d Dep't 1985) (internal quotation marks omitted). "[T]o recover damages for breach of contract," an insured is "required to prove damages resulting from that breach, and their failure to do so [is] fatal to that cause of action." *Alpha Auto Brokers, Ltd.*, 286 A.D.2d at 310 (reversing jury verdict in favor of insured and dismissing the complaint where insured "presented no evidence as to the pre- or post-fire value of the premises"). Accordingly, "[a]n insured who fails to establish . . . the value of the loss may not recover under the policy." *Prendergast v. Pac. Ins. Co.*, No. 09-cv-6248, 2012 WL 1044568, at *5, 2012 U.S. Dist. LEXIS 43084, at *13 (W.D.N.Y. Mar. 28, 2012) (citing *Victoria Camera, Inc. v. Guirida*, 566 F. Supp. 796, 798 (S.D.N.Y.1983)).

For the reasons discussed above, Plaintiff's loss under the Policy is limited to the collapse of the roof. Plaintiff failed to adduce any evidence regarding the value of the roof or from which to infer its value, e.g., the market value of the building before and after the collapse or the cost of replacing the roof with one of like kind or quality.[23] On the other hand, the evidence adduced by Defendant established that the roof was worthless. Herbert Cannon, Allstate's architectural expert, opined that the roof structure had no value whatsoever prior to the collapse. (Ex. D-35, at 4). He testified that, due to the "condition of the structure, . . . the roof had absolutely no value [and] there was nothing that could be salvaged." (T. 383). Having considered all of the trial evidence, the Court finds Mr. Cannon's opinion regarding the value of the roof to be credible and well supported. Plaintiff is therefore not entitled to damages for the loss of the roof.

---

[23] Plaintiff also failed to demonstrate the value of any other loss he incurred, such as the cost of hauling debris. For example, Plaintiff seeks $5,150 in damages under "Additional Protection 1" for the cost of debris removal. "Ordinarily," however, "the amount of insurance set forth in the policy is the measure of coverage rather than of damages." *Naiman v. Niagara Fire Ins. Co.*, 285 A.D. 706, 708 (1st Dep't 1955). Plaintiff did not present any evidence indicating how that figure was calculated or how it reflects the reasonable expense of removing the debris created by the roof's collapse. Accordingly, even assuming such losses are within coverage, he may not recover under Additional Protection 1.

Because Plaintiff has failed to prove the amount of damages resulting from the collapse of the roof, he may not recover under the Policy.

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that the Clerk of Court is directed to enter judgment in favor of Defendant and to close this case.

**IT IS SO ORDERED.**

Dated: December 3, 2018
Syracuse, New York

Brenda K. Sannes
U.S. District Judge